IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA      )
ex rel. RICHARD SHARP,        )
                              )
            Petitioner,       )
                              )
       v.                     )      No. 08 C 1668
                              )
GERARDO ACEVEDO, Warden,      )
                              )
            Respondent.       )


## OPINION AND ORDER


Following a jury trial in the Circuit Court of Cook
County, Illinois, Richard Sharp was found guilty of first degree
murder and sentenced to 28 years' incarceration.  His conviction
was affirmed on direct appeal and a postconviction petition was
subsequently denied.  He was denied leave to file a successive
postconviction petition.  In his pending federal habeas corpus
petition, Sharp raises seven claims.  Respondent[1] contends two of
the claims are procedurally defaulted and that all claims fail on
their merits.

---

[1]Gerardo Acevedo, the current warden of Hill Correctional
Center where Sharp is incarcerated, will be substituted for named
respondent Donald Hulick.

Respondent relies on the description of the evidence contained in the Illinois Appellate Court decision on direct appeal. Factual determinations of the state court, including descriptions of the evidence that was before the court, are presumed correct, unless there is clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); Smith v. Grams, 565 F.3d 1037, 1043 (7th Cir. 2009); Daniels v. Knight, 476 F.3d 426, 434 (7th Cir. 2007); Easley v. Frey, 433 F.3d 969, 970 (7th Cir. 2006). With limited exception, see Pet. Reply § 1, petitioner does not dispute these factual descriptions, only the legal conclusions to be drawn therefrom.

In 2002, following a jury trial, Sharp was found guilty of first degree murder based on his being accountable for the murder of Andrew Jackson as the driver for two persons who shot at Jackson. Sharp was sentenced to 28 years' incarceration. On direct appeal, Sharp raised that it had not been proven beyond a reasonable doubt that Sharp had participated in a murder or that Jackson had been murdered. He also raised evidentiary issues regarding portions of his confession and the medical examiner's report, including whether trial counsel had been ineffective for failing to raise certain evidentiary objections. In an unpublished decision dated June 9, 2004, the Illinois Appellate Court affirmed. The Illinois Supreme Court denied leave to appeal and no petition for certiorari was filed.

On March 18, 2005, Sharp filed a _pro se_ postconviction petition and a supplement contending his conviction was void and the trial court was without jurisdiction because the indictment cited an outdated murder statute. Sharp also contended his trial counsel was ineffective for failing to raise this issue. On May 18, 2005, the trial court held the petition to be frivolous and dismissed it. On June 18, 2005, plaintiff moved for reconsideration, including contending that the court had failed to address issues raised in his supplement, including that a witness's testimony was perjured and that appellate counsel on direct appeal had failed to appear for oral argument.[2] On August 11, 2005, the motion for reconsideration was denied by written order. This denial states that the same issues are again raised, but again refers only to the claimed deficiency in the indictment. On appeal, counsel was appointed, but appellate counsel moved to withdraw on the ground there was no nonfrivolous ground for appeal. In response to the motion to withdraw, Sharp raised the perjury and oral argument issues. On January 18, 2007, appellate counsel's motion was granted and the dismissal of

_____

[2]The copy of the supplement attached to the reconsideration motion contains these contentions. Appellate Rec. for 05-3690, Vol. (C) (supp: certain records) at 72-73. The version of the supplement that initially appears in this appellate record does not contain these contentions. See _id._ at 37-38 (containing consecutive page numbering, but nonconsecutive paragraph numbering).

the postconviction petition was affirmed by unpublished order. On September 26, 2007, leave to appeal to the Illinois Supreme Court was denied and no petition for writ of certiorari was filed.

In October 2007, Sharp sought leave to file a successive postconviction petition, again raising issues regarding the wrong statute being cited in the indictment and alternatively contending he was entitled to day-for-day good-time credit which existed under the outdated statute cited in the indictment. Sharp contended he was relying on new precedent issued after the denial of his first postconviction petition. In its ruling, the court notes that Sharp was sentenced under a truth-in-sentencing statute that requires he serve the entire sentence. It also held that the new case law cited by Sharp was inapplicable to his situation. On April 22, 2008,[3] the motion was denied on the ground that Sharp had not satisfied the cause-and-prejudice standard for a successive petition. As to the denial of leave to file a successive petition, Sharp represents that his "notice of Appeal was denied on 7/3/08." Motion to Reinstate [9] at 2.[4]

_____

[3]The copy of the order is stamped June 22, 2007. See Resp. Exh. M. However, since the motion was filed in October 2007, that cannot be the correct date. In his Motion to Reinstate [9] at 2, Sharp states that his motion for leave to file a successive petition was denied on April 22, 2008. Respondent does not make any representation as to the date of the order.

[4]Respondent makes no representation regarding any appeal.

- 4 -

Sharp's federal habeas corpus petition was filed on March 31, 2008. However, since the petition indicated that the motion to file a successive petition was still pending, the petition was summarily dismissed without prejudice based on failure to exhaust, with it being indicated that Sharp could move to reinstate within 30 days after termination of the successive petition proceedings. On July 31, 2008, after the denial of his appeal, Sharp moved to reinstate his petition. That motion was granted and respondent thereafter responded to the petition.

As summarized in the Appellate Court's decision on direct appeal, the evidence before the jury included the following.

> Forensic Investigator Kathleen Gahagan testified that shortly after midnight on June 22, 2000, she received a homicide assignment and was directed to proceed to 111th and South Vernon in Chicago. There, she observed a bullet hole through the second floor window, a bullet casing[5] in the street and blood on the curb. Investigator Gahagan testified that after processing the scene she went to Roseland Hospital because "[t]he victim was [there]." Once she arrived at the hospital, she spoke with the beat officer and learned the name of the victim and his birth date. The victim was fingerprinted for identification purposes and photographed. Investigator Gahagan identified those photographs in open court and the photographs were admitted into evidence.

---

[5]Elsewhere, the Appellate Court states the casing found by Gahagan was .45 caliber. Direct Appeal, at 2.

People v. Sharp, No. 1-02-3730 at 8 (1st Dist. Ill. App. Ct. June 9, 2004) (unpublished order) (provided as respondent's Exh. D) ("Direct Appeal").

The Appellate Court summary also included the following description of evidence.

> Michael Watson testified that on June 21, 2000, he was at defendant's mother's house located at 111th Street between Indiana and Edbrook Streets.[6] Watson lent defendant his car, a Chevy Celebrity. Defendant left the house with Watson's car at about 10:00 p.m. and returned the next morning at about 1:00 or 2:00 a.m.
>
> Detective Milton Owens of the Chicago Police Department testified that on July 8, 2000, he was investigating the shooting death of Andrew Jackson. He arrested defendant and Michael Watson at about 10:30 p.m. that same day. After advising defendant of his rights, he spoke to defendant. Defendant denied any participation in or knowledge of the shooting.
>
> The following morning, Detective Owens and Assistant State's Attorney Scott Herbert spoke with defendant again after defendant was advised of his rights. Defendant stated that he picked up two individuals in a car and drove them to 111th and Vernon where the individuals fired shots into a group of Gangster Disciples (GD's). Defendant further stated that he was then instructed to drive away from the scene. In a later interview, when speaking to Detectives Przepiora and Golden, defendant again denied any participation in the shooting. Thereafter, Detectives Przepiora and Golden confronted defendant with information they had gathered from their investigation. Defendant then stated that he had participated in the shooting, but only that he agreed to drive two armed individuals to shoot at members of the GD's in retaliation for an earlier shooting. Later that

---

[6]The correct spelling of the street name is Edbrooke.

afternoon, defendant was again interviewed and
gave a videotaped statement wherein defendant
admitted his involvement in the shooting of
Andrew Jackson.  The statement was admitted into
evidence and published to the jury.

In the statement, defendant admitted that
he was a member of the Black Disciples (BD's)
and that at the time of the shooting, the BD's
were at war with the GD's.  At approximately
10:30 p.m, on June 21, 2000, defendant borrowed
Michael Watson's car, a Chevy Celebrity, to get
something to eat.  On the way, he was "flagged
down" by some BD's near 111th and Edbrook.  He
was told that Orlando Coleman (Lando) wanted to
talk to him.  Lando approached the car and told
defendant to take Steve Shempert and Erich
English (Jody-Mo) over to Vernon to go shoot the
GD's.  Defendant stated that initially he did
not want to take them but Lando reminded him
that the GD's had tried to kill his cousin
earlier that day so defendant "got hyped up" and
agreed to take them.  Lando, English and
Shempert walked with another individual, Antoine
Tillman, to a nearly porch and defendant saw
Tillman hand something to Steve and Jody-Mo.
Defendant could not see what was handed to them
but thought it was "some guns."  Steve and Jody-
MO then got into the car defendant was driving.
Jody-Mo got into the front passenger seat and
Steve was seated right behind him.  Following
Jody-Mo's directions, defendant drove to 111th
and Vernon.

As he approached Vernon, Jody-Mo told
defendant to slow down because he saw some GD's.
Defendant slowed down and Steve and Jody-Mo
began firing out of the car.  Steve had a
revolver and Jody-Mo had a "big automatic."
After 5 shots were fired, Jody-Mo instructed
defendant to drive away.  Defendant, following
Jody-Mo's directions, drove back to 111th and
Edbrook.  Once there, Steve and Jody-Mo got out
of the car and bragged that they "took care of
business."  Lando then instructed defendant to
"get the fuck off the block with that hot ass
car," so defendant drove to his home and
returned the car to Watson.

The next day, defendant saw Steve and Jody-Mo. Steve had a "Defender" newspaper in his hand and was bragging. The "Defender" said that a man was shot in a drive-by shooting at 111th and Vernon. Defendant found out that a man named "Drew" had been shot.

Toby Davidson testified that he was present in the area of 110th and Edbrook on the evening of June 21, 2000, but was not present for the shooting. He admitted that he was a member of the BD"s and that he had prior convictions for robbery and burglary.

Early in the day of June 21, 2000, Davidson was at the intersection of Michigan and 111th Street and witnessed a verbal altercation between Chris, a BD, and Eddie, a GD. Eddie left the area. Later, while sitting on his porch, Davidson saw Eddie shoot from his car at Steve Shempert, Chris Shempert and James Smith.

At approximately 10:30 that evening, Davidson was at 111th and Edbrook and saw defendant leave the area and return with a car. Defendant told Davidson that he was "going to go shoot at the GD's."[7] While Steven and Jody-Mo waited in the car, defendant retrieved two guns, a .45 caliber and a .38 caliber from his mother's house. They then drove away and returned about 20 minutes later.

The parties stipulated to the testimony of deputy medical examine Dr. Tae Lyong An. The parties stipulated that if called to testify, Dr. An, would state that on June 22, 2000, he performed an autopsy on Andrew Jackson. He would further testify that the cause of Andrew Jackson's death was gunshot wounds and that the manner of death was homicide. Dr. An would also testify that his entire report "is a true and accurate copy of the postmortem examination ... and that this postmortem examination is regularly kept in the normal course of business at the Cook County Medical Examiner's Office."

---

[7]Petitioner objects that his making this statement is unsupported by the record. Davidson testified that Sharp said: "He fin [phonetic] to go shoot at the Gangster Disciples." Aug. 7, 2002 Tr. W-16.

Dr. An's report was admitted into evidence as People's Exhibit #33.

Defendant testified in his defense. Defendant stated that after being arrested for the murder of Andrew Jackson he asked for an attorney. The next morning, a detective threatened to lock up his fiancée and take away his kids if he did not tell them what they wanted to hear. Defendant then told Assistant State's Attorney Scot Herbert that on June 21, 2000, Lando asked him to take Eric English (Jody-Mo) and Steve Shempert to pick up some money. Defendant knew English but did not know Shempert. As they were driving, English told him to stop the car. Before defendant knew what was happening, he saw guns and heard gunshots. When defendant said, "what's wrong with ya'll. Ya'll crazy," English pointed the gun at him and told him to drive away. The next day, defendant found out that someone had been shot from reading an article in the newspaper.

Defendant then testified that after his arrest, Detective Golden physically abused him. Detective pushed defendant into a wall where he hit his head causing him to pass out. After he came to, defendant did what Detective Golden told him to do because he did not want to be hit again. Detective Golden told defendant what to say to Assistant State's Attorney Herbert. Defendant stated he thought he would be able to go home after his confession. Defendant also testified that he was never given his Miranda rights.

On cross-examination, defendant admitted that he drove to the area of 111th and Vernon the night Jackson was shot. He denied being a member of the BD's and denied driving to the area for the purpose of retaliation. He further testified that some of the statements in his videotaped statement were not true.

Id. at 2-6.

Petitioner states seven grounds for relief. Grounds One and Two are that there was insufficient evidence linking Sharp to

the death of Jackson or establishing that Jackson was the person murdered at 111th and Vernon. Ground Three is that trial counsel was ineffective for failing to object to the admission of the portion of plaintiff's confession in which he stated he learned the victim's identity from a newspaper. Ground Four is that the prosecution used the perjured testimony of Davidson. Ground Five is based on the indictment citing the incorrect murder statute. Ground Six is that appellate counsel failed to raise the insufficient indictment argument on direct appeal or contend that trial counsel was ineffective for failing to raise this ground in the trial court. Ground Seven is that appellate counsel on direct appeal was ineffective for failing to appear for oral argument.

Respondent contends grounds Four and Seven are procedurally defaulted because Sharp has exhausted his state court remedies and these grounds were not raised in state court. See Crockett v. Hulick, 542 F.3d 1183, 1192 (7th Cir. 2008), cert. denied, 129 S. Ct. 1353 (2009). As discussed above, however, Sharp attempted to raise these issues in his postconviction petition, but the issues were not addressed by the trial court. Since these claims otherwise fail on their merits, they will be addressed on their merits without resolving whether they were procedurally defaulted because not fairly presented to the Illinois courts.

In considering the grounds for relief raised by petitioner, this court must defer to decisions on the merits that were made by the Illinois courts. See 28 U.S.C. § 2254(d). The pertinent state court decision for each issue is that of the last court to address the merits of that issue. Smiley v. Thurmer, 542 F.3d 574, 580 (7th Cir. 2008). Relief may be granted

> only if the state court's "decision was contrary to, or involved an unreasonable application of, Supreme Court precedent," [Daniels v. Knight, 476 F.3d 426, 433 (7th Cir. 2007)], or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, 28 U.S.C. § 2254(d)(2). To grant habeas relief under the "contrary to" clause, we must find that the state court reached a result opposite to that reached by the Supreme Court on materially indistinguishable facts. See Williams v. Taylor, 529 U.S. 362, 405 (2000); Jackson v. Miller, 260 F.3d 769, 774 (7th Cir. 2001). To obtain relief under the "unreasonable application" clause, a habeas petitioner must show that the state court's decision unreasonably extended a clearly established Supreme Court precedent to a context where it should not have applied or unreasonably refused to extend such precedent to a context where it should have applied. Jackson, 260 F.3d at 774. The state court's factual findings are presumed correct; this presumption can be rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 348 (2003); Barrow v. Uchtman, 398 F.3d 597, 603 (7th Cir. 2005). In short, the state court decision must be "both incorrect and unreasonable." Washington v. Smith, 219 F.3d 620, 628 (7th Cir. 2000) (emphasis in original); see also Terry Williams, 529 U.S. at 407-08.

Arredondo v. Huibregtse, 542 F.3d 1155, 1167-68 (7th Cir. 2008), cert. denied, 129 S. Ct. 968 (2009). "[A]n unreasonable decision, in this context, is one 'well outside the boundaries of permissible differences of opinion.'" Adams v. Bertrand, 453 F.3d 428, 432 (7th Cir. 2006) (quoting McFowler v. Jaimet, 349 F.3d 436, 455 (7th Cir. 2003)).

Petitioner's first two grounds are that there was insufficient evidence to support his conviction. Ground Three, in part, is related to the first two Grounds because Ground Three attacks some of the evidence relied on to support the conviction. In a habeas corpus proceeding attacking a state conviction, the applicable sufficiency of the evidence standard is that set forth in Jackson v. Virginia, 443 U.S. 307, 324 (1979); Adams, 453 F.3d at 432. "In challenging the sufficiency of the evidence, [petitioner] faces a 'daunting task.' On review of such a challenge, we view the evidence and all reasonable inferences derived therefrom in the light most favorable to the [prosecution], defer to the jury's credibility determinations, and overturn a verdict 'only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.' In other words, we will reverse 'only if the fact finder's take on the evidence was wholly irrational.'" United States v. Blanchard, 542 F.3d 1133, 1134 (7th Cir. 2008) (citations omitted). See also Adams,

453 F.3d at 432; United States v. Boling, 2009 WL 1259014 *5-6 (S.D. Ill. April 30, 2009).

Here, the Illinois Appellate Court recited the proper constitutional standard. See Direct Appeal, at 6 ("When a defendant is challenging the sufficiency of the evidence, the relevant inquiry is whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). The only question is whether the standard was reasonably applied. See Adams, 453 F.3d at 432-33. In establishing that Jackson had been murdered near 111th and Vernon, the Appellate Court relied on defendant's admissions in his confession that, while at that location, shots had been fired from his vehicle; that he read in a newspaper the next day that "Drew" had been shot at that location; and his acknowledgment that Andrew Jackson had been killed at 11:10 p.m. on June 21, 2000. Direct Appeal, at 7-8. It apparently also relied on Investigator Gahagan's testimony that she observed bullet evidence and blood at the scene and, at the hospital, Jackson's body was identified as the victim from that scene.

There is no constitutional infirmity in using the admission of a criminal defendant against the defendant himself, see Lilly v. Virginia, 527 U.S. 116, 127 (1999), even as to facts for which he does not have personal knowledge, see Michael H.

F.3d at 432; <u>United States v. Boling</u>, 2009 WL 1259014 *5-6
(S.D. Ill. April 30, 2009).

Here, the Illinois Appellate Court recited the proper
constitutional standard. <u>See Direct Appeal</u>, at 6 ("When a
defendant is challenging the sufficiency of the evidence, the
relevant inquiry is whether, after viewing all of the evidence in
the light most favorable to the prosecution, any rational trier
of fact could have found the essential elements of the crime
beyond a reasonable doubt."). The only question is whether the
standard was reasonably applied. <u>See Adams</u>, 453 F.3d at 432-33.
In establishing that Jackson had been murdered near 111th and
Vernon, the Appellate Court relied on defendant's admissions in
his confession that, while at that location, shots had been fired
from his vehicle; that he read in a newspaper the next day that
"Drew" had been shot at that location; and his acknowledgment
that Andrew Jackson had been killed at 11:10 p.m. on June 21,
2000. <u>Direct Appeal</u>, at 7-8. It apparently also relied on
Investigator Gahagan's testimony that she observed bullet
evidence and blood at the scene and, at the hospital, Jackson's
body was identified as the victim from that scene.

There is no constitutional infirmity in using the
admission of a criminal defendant against the defendant himself,
<u>see Lilly v. Virginia</u>, 527 U.S. 116, 127 (1999), even as to facts
for which he does not have personal knowledge, <u>see</u> Michael H.

Graham, _Federal Prac. & Proc.: Evid. (4th Interim Ed.)_ § 7024 (2006). The federal Constitution did not preclude using Sharp's admission that the person shot at on the night in question was Jackson. The Illinois Appellate Court held that the use of this aspect of Sharp's confession also did not violate Illinois evidentiary rules. See _Direct Appeal_ at 11-12. In this proceeding, the Appellate Court's interpretation of state law must be accepted. See _Earls v. McCaughtry_, 379 F.3d 489, 495 (7th Cir. 2004). Therefore, Sharp's confession as to the identity of the murder victim was admissible evidence and, being admissible evidence, trial counsel's failure to object to its admission could not have been ineffective assistance of counsel. _Hough v. Anderson_, 272 F.3d 878, 898 (7th Cir. 2001); _United States ex rel. Garrett v. Acevedo_, 608 F. Supp. 2d 1005, 1014-15 (N.D. Ill. 2009). Additionally, Investigator Gahagan's testimony regarding physical evidence at the scene corroborated that a shooting of a victim occurred at 111th and Vernon. Her testimony and the medical examiner's report established that Jackson died of a gunshot wound that evening. Sharp's testimony plus the corroborating evidence sufficiently supports that Jackson was the murder victim.

There is also sufficient evidence to support the jury's verdict that Sharp participated in the murder. As Sharp concedes, there is independent evidence supporting that Sharp was

involved in a shooting near 111th and Vernon. There need not be eyewitness testimony that a person saw Jackson being hit by a bullet fired from the vehicle Sharp was driving. The circumstantial evidence that bullets were fired from the vehicle at a particular location and that Jackson died of gunshot wounds incurred at that location is sufficient to support that Sharp participated in the gunshot murder of Jackson.[8] Such circumstantial evidence is sufficient to support defendant's conviction. Cf. McFowler, 349 F.3d at 442-43, 447-48, 456-57. The Illinois Appellate Court's holdings as to sufficiency of the evidence were not unreasonable applications of Supreme Court precedent. No relief will be granted on Grounds One and Two.

As to Ground Three, the use of Sharp's admission that Jackson was the victim has already been addressed. Sharp also objects to the use of his confession of the source of that admission. The confession states that Sharp learned that a person had died at the sight of their shooting and the victim's name was "Drew" when, in Sharp's presence, Shempert bragged about the shooting while pointing to an article about it in the *Chicago*

---

[8]Sharp raises issues regarding his being involved in a shooting that resulted in Jackson's death. To the extent there is sufficient evidence linking Sharp's shooting incident with Jackson's death, Sharp does not presently argue that there is insufficient evidence of his intent to participate in a shooting. In any event, there is also sufficient evidence of Sharp's intent.

*Defender* newspaper. Although the confession was admitted as voluntarily given, Sharp contends his trial counsel was ineffective for failing to argue that the statement about Shempert's bragging and the newspaper article should have been redacted as hearsay. The Illinois Appellate Court held that these statements were properly admissible as part of his admission. Alternatively, it held that, even if these statements were instead properly characterized as hearsay, trial counsel's conduct was not objectively unreasonable because, after denial of the motion to suppress, trial counsel did not have a sufficient expectation that a request to redact those statements would be granted. <u>See</u> <u>Direct Appeal</u>, at 12.

Here, respondent argues that the statement about Shempert's bragging and the newspaper article are non-hearsay that would have been admitted even if trial counsel had raised the issue. Respondent contends that the statements would have been admissible not to show the truth of the content of the articles, but to show Sharp's intent to participate in a shooting. According to respondent, Sharp's interest in an article about the shooting and listening to Shempert's bragging would have been admissible to reveal Sharp's state of mind, including his agreement to participate in the shooting. Illinois courts admit into evidence as non-hearsay "statements offered for their effect on the listener or to explain the subsequent course

of conduct of another." People v. Carroll, 322 Ill. App. 3d 221, 751 N.E.2d 44, 46 (2d Dist. 2001). If not otherwise admissible as a party-admission, the statements could have been admitted on the ground that the bragging of Shempert and Sharp's interest in the article could support the two had acted together.

An element of an ineffective assistance of counsel claim is "that counsel's performance fell below an objective standard of reasonableness as determined by prevailing professional norms." Whitman v. Bartow, 434 F.3d 968, 972 (7th Cir. 2006). To the extent these parts of the confession were otherwise admissible, trial counsel's conduct did not violate this standard. Hough, 272 F.3d at 898; Garrett, 608 F. Supp. 2d at 1014-15. Even if the trial court possibly would have ruled otherwise, as the Appellate Court held, that likelihood was not sufficient that counsel's failure to raise the issue fell below a standard of reasonableness. Ground Three does not state a basis for relief.

In Ground Four, it is alleged that Davidson's testimony as to Sharp obtaining the guns and Sharp making a statement that he was going to shoot GD's was perjurious. At trial, Sharp attempted to impeach this testimony by bringing out that, in his statements to the police shortly after the murder, Davidson had stated two others had been the source of the guns. In his postconviction petition and now, Sharp contends Davidson's

testimony that Sharp supplied the guns and wanted to shoot GD's was perjurious. As he did with his postconviction petition, Sharp provides an affidavit of his mother ("Elaine") regarding conversations she had with Davidson's mother ("Loretta") and Sharp's trial attorney at the time of sentencing. There is no affidavit from Davidson or his mother. Sharp also provides the police summary of Davidson's statement.

> The State's knowing use of false evidence may violate due process. Napue v. Illinois, 360 U.S. 264, 269 (1959); United States v. Agurs, 427 U.S. 97, 103 (1976). The state's utilization of false testimony, in and of itself, does not violate a defendant's due process rights. To violate due process, the state must know of the testimony's falsehood and the false testimony must have been reasonably likely to affect the judgment of the jury. Agurs, 427 U.S. at 103. Mere inconsistencies in a witness's testimony are insufficient to demonstrate testimony is false [or that the state knew it was false], and instead speak to the witness's credibility. Simental v. Matrisciano, 363 F.3d 607, 615 (7th Cir. 2004); United States v. Magana, 118 F.3d 1173, 1193 (7th Cir. 1997). Rather, the false testimony must be directly related to the defendant's guilt or innocence, and not on a collateral matter. Simental, 363 F.3d at 615; United States v. Adcox, 19 F.3d 290, 295 (7th Cir. 1994). Finally, if the defendant had an ample opportunity to cross-examine the witness and expose the perjury, it is unlikely that the false testimony impacted the jury's verdict. Simental, 363 F.3d at 615.

United States ex rel. Thurmond v. Gaetz, 2009 WL 185429 *3 (N.D. Ill. Jan. 21, 2009).

Elaine's statement as to what Loretta stated is hearsay. But even accepting Loretta's purported statements, Elaine's affidavit does not support that perjury occurred. Loretta does not state that Davidson admitted to her that he testified falsely. Davidson was 13 years old at the time of the murder and 15 years old at the time of the trial, so his mother was present during the formal interview of Davidson at a police station. According to Elaine, Loretta stated that she did not know Sharp and that Davidson made no mention of Sharp during his statement at the police station. The first fact is not particularly pertinent; a mother does not necessarily know everyone her 13-year-old son knows. The latter fact is consistent with the police report of the police station interview which does not mention Sharp, but trial counsel was already aware of this police report. The police report, however, also mentions an informal interview with Davidson that occurred prior to his being called to the police station with his mother for formal questioning. Loretta was not present for the first interview and apparently was unaware of or forgot that this interview occurred. The police report states that, when first interviewed without his mother present, Davidson mentioned "Richie Poo" (Sharp) pulling up in a car and picking up Mo and Shempert. Even taking into account Loretta's purported statements, they only support what

was known at trial:  Davidson's trial testimony was inconsistent
with his prior statements to the police.

All Sharp has to support his perjury claim is that
Davidson's trial testimony was inconsistent with his prior
statements to the police.  At trial, Sharp's attorney took the
opportunity to attempt to impeach Davidson on this inconsistency.
There is an insufficient basis to infer knowing use of perjurious
testimony and, in any event, there was not likely to have been an
effect on the trial since Sharp already impeached Davidson with
the inconsistent testimony.  Ground Four does not state a basis
for relief.

In Ground Five, Sharp contends his indictment was
improper because it cited that he violated 720 ILCS 5/9-1 (1992
ILCS as amended) instead of 720 ILCS 5/9-1 (2000).  The trial
court denied relief on the ground that citing the wrong year for
the statutory compilation still sufficiently identifies the
murder statute, which was in existence before, during, and after
2000.  There is no contention that the indictment failed to
allege all the necessary elements of the offense as defined by
the law in effect in 2000.  The indictment provided Sharp with
sufficient notice of the charged crime.  See United States v.
Fassnacht, 332 F.3d 440, 444-45 (7th Cir. 2003).  Ground Five
does not state a basis for relief.  Since the indictment was not

improper, the related ineffective assistance of counsel claim (Ground Six) also fails.

In Ground Seven, Sharp contends his counsel on direct appeal was ineffective because she failed to appear for oral argument before the Illinois Appellate Court. The record, however, supports that she requested a rescheduling of oral argument, which was granted, and that the Appellate Court subsequently ordered that the case would be decided without oral argument. Therefore, this Ground lacks a factual basis. In any event, there is nothing to support that not having oral argument materially affected the result of the appeal. Sharp would not be able to satisfy the prejudice component of his ineffective assistance of counsel claim. See United States v. Birtle, 792 F.2d 846, 849 (9th Cir. 1986); United States v. Neeley, 2001 WL 521841 *5 (N.D. Ill. May 14, 2001); Cox v. Ebert, 2007 WL 2948160 *23 (S.D.N.Y. Oct. 10, 2007); Page v. United States, 2007 WL 1002515 *5 n.7 (E.D. Tenn. March 30, 2007, as corrected April 10, 2007); Smalls v. McGinnis, 2004 WL 1774578 *32 (S.D.N.Y. Aug. 10, 2004). Ground Seven does not state a basis for relief.

IT IS THEREFORE ORDERED that Gerardo Acevedo is substituted for respondent Donald Hulick and the Clerk of the Court is directed to amend the docket accordingly. The Clerk of the Court is further directed to enter judgment in favor of

respondent and against petitioner denying the petition for writ of habeas corpus.  If petitioner wishes to appeal this order, he must file a Notice of Appeal to the United States Court of Appeals for the Seventh Circuit with the Clerk of the Court, United States District Court for the Northern District of Illinois, 219 South Dearborn Street, 20th Floor, Chicago, Illinois 60604, within thirty (30) days of the entry of the judgment in this case.  Any notice of appeal should also be accompanied by a request for a certificate of appealability, including a statement as to why a certificate should issue.  See 28 U.S.C. § 2253; Fed. R. App. P. 22(b).

ENTER:

UNITED STATES DISTRICT JUDGE

DATED:  JULY /0     , 2009